United States Court of Appeals,

Fifth Circuit.

No. 95-30662.

OCCIDENTAL CHEMICAL CORPORATION, and Travelers Insurance Company, Plaintiffs-Appellees,

v.

ELLIOTT TURBOMACHINERY COMPANY, INC., Defendant-Appellant,

and

Liberty Mutual Insurance Company, Defendant.

June 3, 1996.

Appeal from the United States District Court for the Western District of Louisiana.

Before REYNALDO G. GARZA, WIENER and STEWART, Circuit Judges.

STEWART, Circuit Judge:

This interlocutory appeal raises issues of first impression involving Louisiana contract law. Elliott Turbomachinery Company appeals the district court's decision denying its second motion for summary judgment regarding the plaintiffs' claim for gross fault.[1] The district court held that the warranty provision in Elliott's commercial contract, which limits the duration of its liability for gross fault to only one year, is violative of Louisiana public policy and therefore invalid. After reviewing and analyzing applicable Louisiana law, we are convinced that the district court correctly interpreted the provision. Therefore, we affirm the district court's judgment.

## FACTS

Occidental Chemical Corporation executed an agreement with a general contractor, Braun, for an engineering construction project at Occidental's St. Charles plant.[2] The agreement authorized Braun to issue purchase orders and execute subcontracts (subject to Occidental's approval) to obtain

---

[1] The district court granted Elliott's first motion for summary judgment as to the plaintiffs' claims for negligence, breach of contract, breach of express and implied warranties, and redhibition.

[2] Occidental purchased the St. Charles plant in 1982.

goods and services for Occidental.

Pursuant to this agreement, Braun subcontracted Elliott to rerate[3] certain turbines and compressors owned by Occidental. Elliott had manufactured the turbines and compressors for the previous owner of the St. Charles plant. The subcontract between Braun and Elliott contained warranty and liability provisions limiting the duration of Elliott's warranty for its rerates.[4] Specifically, Elliott's warranty ended twenty-four months from the date of shipment or twelve months from the date of first use, whichever period was shorter. Further, the provisions limited Elliott's responsibility to repair or replacement and made Elliott completely immune from liability for damages.

Braun also executed a second subcontract with Elliott which required Elliott to install the

---

[3]"Rerate" is a procedure to create a modification in a turbine or compressor in order to change the performance characteristics of the turbine or compressor.

[4]The rerate agreement provided as follows:

> 27. *WARRANTY REMEDIES* If within 24 months from date of shipment, or within 12 months from date first used as intended, whichever occurs first, Buyer discovers defects, errors, omissions, performance deficiencies, or breach of any warranty as to the items, materials, or work supplied by Seller, then Seller shall promptly repair or replace without cost to Buyer, the items or materials in question and reperform any defective work, and Buyer will provide at no cost to Seller, all necessary cranes and rigging as required for such work. If Seller fails after reasonable written notice to proceed promptly with the repair or replacement of the defective items or materials, Buyer may repair or replace such items or materials and charge all reasonable direct costs associated with such work, except for any crane or rigging expenses, to the Seller without voiding the warranties herein.
>
> The warranties in Clauses 25, 26, and 27 and the implied warranties of merchantability and fitness of purpose shall be Seller's sole warranty responsibilities to Buyer or Buyer's Customer and are given in lieu of all other warranties, express or implied. The remedies provided in this Clause 27 are the sole remedies provided to Buyer and its Customers for any failure of Seller to comply with its warranty obligations.
>
> 50. *LIMITATION OF LIABILITY* Notwithstanding any other provision in the Purchase Order or elsewhere to the contrary, in no event shall Seller or its suppliers be liable, whether arising under contract, tort (including negligence), strict liability, or otherwise, for loss of anticipated profits, loss by reason of plant shutdown, nonoperation or increased expense of operation, service interruption, cost of purchased or replacement power, claims of buyer's customers, subcontractors of [sic] suppliers, cost of money, loss of use of capital or revenue, or for any special, incidental, indirect or consequential loss or damage of any nature arising at any time or from any cause whatsoever.

equipment after it was rerated. This contract also contained warranty and liability provisions.[5] The provisions limited Elliott's installation services warranty to ninety days from the date Elliott completed the installation. Further, the provisions restricted Braun and Occidental's remedy to repair or replacement and excluded all other warranties as well as Elliott's liability for special or consequential damages.

Elliott rerated Occidental's J802R2 compressor, which had been manufactured by Elliott in 1966, and shipped it to the St. Charles plant in July of 1989. Elliott completed installation of the compressor in August of 1989. On December 24, 1990 during a harsh freeze, the compressor failed.

---

[5]The Installation agreement provided as follows:

> 9. *WARRANTY REMEDY* Should subcontractor be notified of any failure to conform to the warranty in ARTICLE 8 (MATERIALS AND WORKMANSHIP WARRANTY) above within a period of ninety (90) days after completion of Subcontractor's work or delivery of goods and materials, Subcontractor, without cost to Braun or Owner, shall promptly correct, repair, or replace the materials or workmanship in whatever manner necessary so that all the requirements of this subcontract and the obligations of Subcontractor under Article 8 are satisfactorily fulfilled and Braun will provide at no cost to Subcontractor, all necessary cranes and rigging for such work. If subcontractor fails after reasonable notice to proceed promptly with the correction, repair, or replacement of any defective items, materials, or workmanship, Braun may replace or repair such items or materials, correct such workmanship, and charge all reasonable direct costs, except for any crane or rigging expenses to Subcontractor.
>
> The warranties in Articles 8 and 9 shall be Subcontractor's sole warranty to Braun or Braun's Customer and are given in lieu of all other warranties, express or implied. The remedies provided in this Article 9 are the sole remedies provided to Braun and its Customers for any failure of Subcontractor to comply with its warranty obligations.
>
> 71. *MAXIMUM LIABILITY* Notwithstanding any provision in this subcontract or elsewhere to the contrary [sic], Subcontractor's maximum liability arising at any time from any cause whatsoever, whether in contract, tort (including negligence) strict liability or otherwise, shall not exceed $1,000,000.00 dollars.
>
> 72. *LIMITATIONS OF LIABILITY* Notwithstanding any other provision in the subcontract or elsewhere to the contrary, in no event shall Subcontractor or its suppliers be liable, whether arising under contract, tor [sic] (including negligence), strict liability, or otherwise, for loss of anticipated profits, los [sic] by reason of plant shutdown, nonoperation or increased expense of operation, service interruption, cost of purchased or replacement power, claims of Braun's customers, subcontractors or suppliers, cost of money, loss of use of capital or revenue, or for any special, incidn=ental [sic], indirect or consequential los [sic] or damage of any nature arisning [sic] at any time or from any cause whatsoever.

The compressor suffered extensive damage, which forced Occidental to cease operation of the plant until the compressor was repaired. The compressor failure and shutdown cost Occidental millions of dollars in damages. Traveler's Insurance paid Occidental $7 million in repair costs and consequential damages.

Occidental believed that the compressor failed because Elliott replaced one of the compressor's components (guide vanes) with inferior parts, which damaged the compressor.[6] Occidental and Travelers sued Elliott and its insurer alleging several contractual causes of action. The district court applied the contractual provisions limiting Elliott's warranties and Occidental's recovery. The district court found that the contract expressly excluded most of Occidental's claims, which were filed sixteen months after the date of first use. However, the court held that article 2004 of the Louisiana Civil Code invalidated the contractual provision limiting Elliott's warranty for gross fault. Accordingly, the court denied Elliott's motion for summary judgment on the issue of gross fault. The district court granted Elliott leave to appeal the interlocutory judgment to this court.

## DISCUSSION

### A. *STANDARD OF REVIEW.*

It is well-established that this court reviews de novo questions of law raised in summary judgment appeals. *See Eugene v. Alief Indep. Sch. Dist.,* 65 F.3d 1299, 1303 (5th Cir.1995). More specifically, we review a district court's interpretation of a state statute de novo. *See Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.,* 953 F.2d 985, 987 (5th Cir.1992). The district court's interpretation of article 2004 clearly qualifies for de novo review. In reviewing the issue, we must use the same criteria as the district court, *see General Elec. Capital Corp. v. Southeastern Health Care, Inc.,* 950 F.2d 944, 947-48 (5th Cir.1991), which in this case involve the principles applicable to granting summary judgment, *see id.;* and FED.R.CIV.PRO. 56(c). Nevertheless, our standard of review discussion cannot end here because a state statute is involved.

---

[6]Elliott concedes that the manner in which it attached the component to the diaphragm of the compressor changed over the years. In fact, it had applied three different methods to the compressor at issue. One method was used during the original manufacture in 1966, another method was employed during a previous rerate job in the late 1980s, and a third method was used during the rerate which prompted this litigation.

Our interpretation of a state statute is not accomplished with unfettered discretion. The federal court is bound to answer the question the way the state's highest court would resolve the issue. *See Transcontinental Gas,* 953 F.2d at 988. In addressing an insurance issue, this Court in *Graham v. Milky Way Barge, Inc.,* 824 F.2d 376, 381 (5th Cir.1987) explained as follows:

> When the state courts have not yet decided a particular question, the duty of the federal court is to decide what the state courts would hold if faced with that issue.... In making this determination it is our duty ... to view ourselves ... as an inferior state court and to reach the decision that we think a state court would reach.... As a federal court, it is not for us to adopt innovative theories of state law, but simply to apply the law as it currently exists.... If the law of Louisiana is to be changed, it is up to the Supreme Court of Louisiana and not this court to change the substantive law of that state.

(citations, brackets, and quotations omitted). Accordingly, we must interpret a state statute the way the Louisiana Supreme Court would interpret the statute based upon prior precedent, legislation, and relevant commentary.

## B. *INTERPRETATION OF ARTICLE 2004.*

Both parties agree that no Louisiana court has ever applied article 2004 to a warranty duration provision. Both parties also assert that article 2004 is clear and unambiguous, though both present very different interpretations of the article.

Elliott argues that article 2004 does not apply to a warranty duration provision. It asserts that Louisiana courts routinely enforce warranty duration provisions in commercial contracts. Elliott also contends that article 2004 literally applies to liability provisions, not warranty provisions. As warranties regulate obligations rather than liabilities, article 2004 does not affect warranty provisions. Additionally, Elliott asserts that the law review article written by Professor Saul Litvinoff,[7] which prompted the enactment of article 2004, supports the validity of the warranty provision at issue. Finally, Elliott maintains that invalidating the warranty provision will destroy the parties' freedom to contract, which is valued by the Louisiana Civil Code.

In response, Occidental and Travelers argue that Elliott's warranty provision does not

---

[7]*See* Saul Litvinoff, *Stipulations As To Liability And As To Damages,* 52 TUL.L.REV. 258 (1978). In the article, Professor Litvinoff discusses the validity of various contractual stipulations through which parties attempt to limit their liability in the event of a breach. To some extent, both parties rely on Professor Litvinoff's article to support their respective positions.

expressly apply to gross negligence.[8] They also assert that article 2004 applies to "any" clause limiting liability for intentional and gross fault. Because the present provision directly limits Elliott's liability for gross negligence, it violates article 2004. Further, the appellees contend that Professor Litvinoff's law review article actually supports the district court's interpretation. Finally, they argue that Louisiana's statutory construction principles mandate the district court's interpretation.

In determining which interpretation of article 2004 would likely be adopted by the Louisiana Supreme Court, we will begin with the language of the article and the rules of construction provided in the Civil Code. Article 2004, entitled "Clause that excludes or limits liability," provides as follows:

> Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party. Any clause is null that, in advance, excludes or limits the liability of one party for causing physical injury to the party.

The statutory construction articles in the Louisiana Civil Code provide that "Persons may not by their juridical acts derogate from laws enacted for the protection of the public interest. Any act in derogation of such laws is an absolute nullity." LA.CIV.CODE art. 7. "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." LA.CIV.CODE art. 9. "When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." LA.CIV.CODE art. 10. "Words of law must be given their generally prevailing meaning." LA.CIV.CODE art. 11.

Reading the construction articles together, we find that article 2004 is not clear and unambiguous. The article is susceptible of two reasonable interpretations regarding warranty provisions, as presented by the parties.[9] We therefore must interpret article 2004 in a manner that

---

[8]The record suggests that the parties co-drafted the contract. Accordingly, we will not construe the contract against Elliott, and the rules regarding strict construction do not apply to the present case.

[9]It is undisputed that general contractual provisions seeking to limit liability for gross fault are invalid and unenforceable. *See, e.g., Orthopedic & Sports Injury Clinic v. Wang,* 922 F.2d 220, 224 (5th Cir.1991); *Robin Towing Corp. v. Honeywell, Inc.,* 859 F.2d 1218, 1221 (5th Cir.1988); *Rosenblath's Inc. v. Baker Indus.,* 634 So.2d 969, 973 (La.App.2d Cir.), *writ. denied,* 640 So.2d 1348 (La.1994); *Tony's Auto Parts, Inc. v. Honeywell, Inc.,* 522 So.2d 680, 681 (La.App. 5th Cir.1988); *Banner Chevrolet v. Wells Fargo Guard Serv.,* 508 So.2d 966, 967 (La.App. 4th Cir.1987); and *Carriage Meat Co. v. Honeywell, Inc.,* 442 So.2d 796, 798

best conforms to the purpose of the law and Louisiana public policy. *See* LA.CIV.CODE arts. 7, 10.

Though the comments do not carry the force of law, we may glean from the comments the legislature's intent when enacting the article. The comments to article 2004 indicate that the article does not change the law; it merely "expresses the consequence of the principle of contractual freedom stated in C.C. Art. 1901." Citing the Louisiana Supreme Court in *Freeman v. Dep't of Highways,* 253 La. 105, 217 So.2d 166 (1968), the comments provide a reasoning behind the statute: the clauses "are against public policy because the overriding principle of good faith would be destroyed if it were possible to contract away for liability for fraud." Further, the comments explain that the article does not invalidate clauses which are governed by federal legislation, which relieve liability for delay damage, which relieve liability for slight fault, and which allocate between the parties the risk of potential liability towards third parties (i.e., indemnity or "hold harmless" clauses). Instead, the article prohibits only clauses that exclude or limit liability for intentional or gross fault.

Likewise, insights regarding article 2004 surface in the writings of Professor Litvinoff, who was the inspiration for the provision and also the reporter for the Louisiana Law Institute Committee which revised Louisiana contract law. In particular, we may suppose the purpose of article 2004 from the law review article in which Professor Litvinoff introduces a proposed version of article 2004 amid a thorough discussion of Louisiana public policy and legal history. *See* Saul Litvinoff, *Stipulations As To Liability And As To Damages,* 52 TUL.L.REV. 258 (1978). Professor Litvinoff explains *inter alia* that contractual clauses limiting the duration of a party's obligation of warranty are valid under the Louisiana Civil Code, except in those situations where public policy would be violated. 52 TUL.L.REV. at 295, Professor Litvinoff comments: "Agreed delays for discovery of defects in workmanship, materials, or redhibitory defects, or even delays for eviction to occur must be regarded as valid, without limitations other than those required by the public order[.]" 52 TUL.L.REV. at 295-96. Moreover, on the issue of "public order," Professor Litvinoff clarified that because "gross fault" involves a certain degree of fraudulent intent, "a clause relieving a party of the consequences of his gross fault is ... as greatly opposed to the public order as a clause relieving him

_____

(La.App. 4th Cir.1983).

of the consequences of his intentional nonperformance or fraud." 52 TUL.L.REV. at 279. Reading Professor Litvinoff's restriction on warranty limitations with his explanation of gross fault, we are convinced that although limitations regarding warranties are permissible in most circumstances, such limitations are prohibited when the obligor is guilty of gross fault.

We find that article 2004 stands as a legislative pronouncement of public policy which parties to a contract cannot ignore. Gross fault or gross negligence is so closely akin to intentional fault and fraud that it would disrupt the social order to allow parties to contract in advance to limit liability for gross fault.

> The Louisiana statutes and cases generally define gross negligence as conduct which falls below that which is expected of a reasonably careful person under like circumstances, or which is less than that diligence which even careless men are accustomed to exercise. Gross negligence is also "reckless disregard" or "careless indifference," and may involve a gross or substantial deviation from an expected or defined standard of care.

*Rosenblath's v. Baker Indus.,* 634 So.2d 969, 973 (La.App.2d Cir.1994). Thus, any contractual clause which operates to limit a plaintiff's right to redress a violation for gross fault violates Louisiana public policy. Contractual provisions excluding gross fault may therefore convert an otherwise valid contractual provision into an invalid one.

Elliott attempts to persuade this Court that the contract remains valid in this case because Occidental and Travelers allege gross *negligence* rather than gross *fault,* suggesting that gross fault does not encompass gross negligence. Elliott maintains that gross fault necessarily implicates more than negligence because Professor Litvinoff places gross fault in the same category as intentional fault and fraud. Accordingly, Elliott interprets gross fault as adding another form of "fraud" or "intentional fault." We find this interpretation unnecessarily restrictive and inconsistent with the Louisiana cases applying article 2004. We previously have determined that article 2004 encompasses gross *negligence. See Orthopedic & Sports Injury Clinic v. Wang,* 922 F.2d 220, 224 (5th Cir.1991). Louisiana opinions rendered after our decision in *Wang* have reached the same conclusion. *See, e.g., Broom v. Leebron & Robinson Rent-A-Car,* 626 So.2d 1212, 1216 (La.App.2d Cir.1993).

Further, the Louisiana Civil Code drives a stake through the heart of Elliott's interpretation of gross fault. Article 3506 of the Code expressly refers to negligence when defining gross fault. The

article provides: "The gross fault is that which proceeds from *inexcusable negligence* or ignorance; it is considered as nearly equal to fraud." LA.CIV.CODE art. 3506, § 13 (emphasis added). The legislature obviously intended gross fault to encompass gross negligence. We therefore find no merit to Elliott's characterization of gross fault.

The warranty clause in Elliott's contract has the effect of limiting its liability for gross fault because without the clause Occidental would have over eight more years to bring an action for Elliott's breach.[10] We are convinced that the legislature intended article 2004 to reach warranty clauses effecting gross negligence actions. We, therefore, hold that while Louisiana law permits parties to limit, by contract, the duration of a warranty, article 2004 prohibits provisions limiting the duration of a warranty when gross fault is involved.[11] Consequently, Elliott's warranty provision is void because it impermissibly operates in a manner that limits actions for gross negligence.

## CONCLUSION

Louisiana public policy precludes the agreement that Elliott attempts to enforce through its motion for summary judgment. Article 2004 establishes that Elliott cannot contract in advance to limit its liability for gross negligence. Therefore, we AFFIRM the judgment of the district court denying Elliott's motion for summary judgment.

---

[10]Louisiana law provides that a contractor is liable for non-compliance with a construction contract. LA.CIV.CODE art. 2769; *see also Wetmore v. Blueridge, Inc.* 391 So.2d 951, 953 (La.App. 4th Cir.1980) ("A contractor is bound to warrant his work and is responsible for damages occasioned by defective workmanship or installation"). The statutes provide a warranty period of ten years. LA.CIV.CODE art. 2762. In the absence of Elliott's warranty provision, the rerate work and installation would be covered by the ten year period provided in article 2762. *See Gulf States Util. Co. v. Ecodyne Corp.,* 635 F.2d 517, 521 (5th Cir.1981) (applying article 2762 to a cooling tower); and *Murphy Corp. v. Petrochem Maintenance, Inc.,* 180 So.2d 716, 721 (La.App. 1st Cir.1965) (applying article 2762 to an underground storage tank).

[11]We find it unnecessary to discuss cases not involving or discussing gross fault which have upheld provisions limiting the duration of a warranty. It is conceded that Louisiana permits limitations on warranties as long as public policy is not violated. *See, e.g., Datamatic v. Int'l Business Machines Corp.,* 795 F.2d 458 (5th Cir.1986) (affirming summary judgment for a manufacturer because the contract limited its warranties to one year from installation); and *California Union Ins. Co. v. Bechtel Corp.,* 473 So.2d 861 (La.App. 4th Cir.), *writ. denied,* 477 So.2d 1128 (La.1985) (affirming the granting of a motion for involuntary dismissal because the contract limited the warranty to defects appearing within eighteen months of the shipment date or one year from installation, whichever occurred first). We find these cases distinguishable and therefore give them no weight in determining whether article 2004 reaches warranty provisions that ultimately limit liability for gross fault.

* * * * * *

* * * * * *

* * * * * *